```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

INNOVATIVE SALES AND MACHINE       :
SERVICES, LLC,                     :
                                   :
     Plaintiff,                    :
                                   :
v.                                 :    CASE NO. 3:11cv1472(DFM)
                                   :
MAIER USA, LLC                     :
                                   :
     Defendant.                    :
```

MEMORANDUM OF DECISION

Plaintiff, Innovative Sales and Machine Services, LLC ("ISMS"), brought this breach of contract action against defendant, Maier USA, LLC ("Maier"). After a two-day bench trial on December 16 and 17, 2015, I make the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1]

I. Findings of Fact

A. Parties & Background

This case involves a dispute between a manufacturer of Swiss-style screw machines and one of its distributors. The individuals involved came to know one another through many years in the industry working for different manufacturers and distributors. Two of them entered into an oral agreement on behalf of the parties. For nearly two years, they carried on

---

[1] The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (Doc. #55.)

without incident, but the relationship eventually fell apart, leading to the instant lawsuit.

Plaintiff ISMS, a distributor of Swiss-style screw machines, is a limited liability company in which John Schuld is the only member. (Tr. 12/17/15 AM, pp. 4, 7.)

Defendant Maier USA is a limited liability company owned by Michael Maier, who lives in Germany and also owns Maier Germany. (Tr. 12/17/15 PM, pp. 71-72, 80.)  Maier USA was founded in 2008 to import and distribute Maier Germany products in the United States. (Tr. 12/17/15, pp. 71-72.)  Before 2008, Maier imported and distributed its machines through Methods Machine Tools ("Methods"), the "largest importer of machine tools privately owned" in the United States. (Tr. 12/16/15 AM, p. 18.)  James Kucharski was the product manager of the Maier line at Methods. (Tr. 12/16/15 AM, p. 19.)  He later became the national sales manager at defendant Maier.[2] (Tr. 12/16/15 AM, pp. 17-19; Tr. 12/17/15 PM, p. 72.)

Schuld and Kucharski met in or around 1999.  (Tr. 12/16/15 AM, p. 20; Tr. 12/17/15 AM, p. 6.)  At the time, Schuld worked for Rudel Machinery Company ("Rudel"), which distributed screw machines manufactured by another company called Tornos, where Kucharski was the regional sales manager. (Tr. 12/16/15 AM, p.

---

[2]Maier fired Kucharski in August 2012. (Tr. 12/16/15 AM, p. 47; Tr. 12/17/15 PM, p. 72.)  He currently works for Methods. (Tr. 12/16/15 AM, p. 93.)

20; Tr. 12/17/15 AM, p. 6.)  Schuld and Kucharski became friends and socialized. (Tr. 12/16/15 AM, p. 22; Tr. 12/17/15 AM, p. 6.)

In 2001, Schuld left Rudel to work for his father's company rebuilding, manufacturing, and selling screw machine tooling and replacement parts. (Tr. 12/17/15 AM, pp. 6-7.)  Schuld remained in contact with Kucharski. (Tr. 12/17/15 AM, pp. 7-8.)  After four years at his father's company, Schuld left to start ISMS. (Tr. 12/17/15 AM, pp. 4, 7.)  Schuld hired two independent contractors, Jeff Judd and Barry Ertel. (Tr. 12/17/15 AM, pp. 9, 10, 22, 58, 68-9, 71, 98.)

After forming ISMS, Schuld contacted Kucharski, who at the time was working as the regional sales manager of Tornos, to ask if Kucharski was satisfied with Tornos's New England distributor, Rudel. (Tr. 12/17/15 AM, p. 8.)  He was not. (Tr. 12/17/15 AM, p. 8.)  In or around 2005, Rudel "fell apart," and Kucharski asked ISMS to become the regional distributor of Tornos products. (Tr. 12/16/15 AM, pp. 22-23; Tr. 12/17/15 AM, pp. 8-9.)

By 2008, Kucharski was working for defendant Maier as its national sales manager. (Tr. 12/16/15 AM, pp. 17-19; Tr. 12/17/15 PM, p. 72.)  ISMS still was distributing Tornos products. (Tr. 12/16/15 AM, pp. 24-27; Tr. 12/17/15 AM, pp. 11, 13.)  Kucharski approached Schuld to discuss ISMS becoming a distributor of Maier products. (Tr. 12/16/15 AM, pp. 24-27; Tr. 12/17/15 AM, pp. 11, 13.)

3

B. The Agreement

In or around April 2008, Schuld and Kucharski, on behalf of the parties, entered into an oral distribution agreement. The material terms included: (i) services; (ii) territory; (iii) exclusivity; (iv) commission; and (v) duration and termination.

1. Services

Under the contract, ISMS was to serve as Maier's distributor. ISMS would market, promote, and sell Maier machines and ancillary equipment. (Tr. 12/16/15 AM, pp. 25-26, 73, 106-07; 12/17/15 AM, pp. 12, 26-27, 90.) ISMS was to pay its own marketing expenses. (Tr. 12/16/15 AM, pp. 97-98; Tr. 12/17/15 PM, pp. 54-56.)

2. Territory

Schuld and Kucharski agreed that ISMS would distribute Maier machines in the six New England states.[3] (Tr. 12/16/15 AM, p. 29; Tr. 12/16/15 PM, pp. 7-8; Tr. 12/17/15 AM, pp. 18, 89-90.) They discussed the area east of the Hudson River in New York because ISMS had several customers there, but Kucharski advised that Maier already had a New York distributor. (Tr. 12/16/15 PM, p. 8; Tr. 12/17/15 AM, pp. 18, 102.) During the time ISMS sold Maier machines, it made only one sale in New York, for which it

---

[3] The six New England states are Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. This was the same territory in which ISMS had sold Tornos products. (Pl. Ex. 2, p. 7; Tr. 12/16/15 AM, p. 29; Tr. 12/16/15 PM, pp. 7-8; Tr. 12/17/15 AM, pp. 18, 89-90.)

4

shared the commission with Maier's New York distributor. (Tr. 12/16/15 PM, p. 10.)

        3.    Exclusivity

ISMS was the exclusive distributor of Maier machines in the New England territory, with the exception of Maier's "house account"[4] with a Massachusetts company called Alpha Grainger Manufacturing, Inc. ("Alpha Grainger").[5] (Tr. 12/16/15 AM, p. 36; Tr. 12/17/15 AM, pp. 21, 89, 94-95; Tr. 12/17/15 PM, p. 79.)

        4.    Commission

The parties agreed that ISMS would receive commissions for selling Maier machines and ancillary items.[6] The parties intended their agreement to be similar to the one ISMS had with Tornos. (Pl. Ex. 2; Tr. 12/16/15 AM, pp. 27-28; Tr. 12/17/15 AM, p. 88.) Under the Tornos agreement, ISMS received 12% commission on the

---

[4] Kucharski explained that a house account is "an account that in the case of Maier and/or Tornos would be called on and taken care of by Tornos or Maier directly without any outside participation from a contracted distributor." (Tr. 12/16/15 AM, p. 37.)

[5] Alpha Grainger had long been a house account of Maier. (Tr. 12/16/15 PM, pp. 27, 37.) Michael Maier is a close friend of the owner, Jake Grainger, who was Maier's first customer. (Tr. 12/17/15 PM, p. 79.) In 2009, when Maier Germany declared bankruptcy and "nobody was buying machines," Jake Grainger bought a machine, at cost or less, to provide Maier with cash flow to continue operating the business. (Tr. 12/17/15 PM, pp. 79-81.)

[6] Maier calculated ISMS's commission payments using an order acknowledgement form, a copy of which was sent to ISMS. (Tr. 12/16/15 AM, p. 61.) Maier paid distributors' commissions 30 days after customers paid in full. (Tr. 12/16/15 AM, p. 101.)

5

net sales price[7] of Tornos-supplied products and 5% on the net sales price of ancillary items. (Pl. Ex. 2, pp. 2, 8.)  ISMS's commission with Tornos did not include house accounts, spare parts, freight and special packing, set-up, labor, or extended warranties. (Pl. Ex. 2, p. 3.)

Between August 2008 and October 2010, Maier paid ISMS a total of $140,308.56 in commissions.[8] (Pl. Ex. 27.)  ISMS never complained that the commission payments were incorrect. (Tr. 12/16/15 AM, p. 110; Tr. 12/17/15 AM, pp. 106-08, 113-14, 117; Tr. 12/17/15 PM, pp. 13-14.)

### 5. Duration and Termination

There was no term to the agreement and either party could terminate it at any time. (Tr. 12/16/15 AM, pp. 36, 112-13; Tr. 12/17/15 AM, p. 54.)  In the event of termination, ISMS would have between 30 days (the industry standard) and 60 days to close

---

[7]The Tornos agreement defined net sales price as "the final selling price to the customer net of discounts, taxes, freight, trade-ins, interest or currency adjustments, financing charges, etc." (Pl. Ex. 2, p. 2.)

[8]Maier often gave customers discounts, which affected the distributor's commission. (Tr. 12/16/15 AM, pp. 27-28, 106-08; Tr. 12/16/15 PM, pp. 5, 13, 22, 27-30, 32-33, 106-08; Tr. 12/17/15 PM, pp. 13-14.)  Kucharski testified that Maier and ISMS agreed to share any discounts on a "two-thirds one-third basis." He explained that "when you calculate the percentage that the discount was of the total sale . . . Maier would take two-thirds of that percentage . . . and then one-third of that percentage would be applied to the commissions for [ISMS]." (Tr. 12/16/15 PM, pp. 18-20.)  Schuld was involved in this process. (Tr. 12/16/15 AM, pp. 111-12; Tr. 12/16/15 PM, pp. 22, 30, 42.)

any outstanding deals. (Tr. 12/16/15 AM, p. 113; Ertel Depo.,[9] pp. 72-73.)

On February 19, 2010, Schuld and Kucharski had a "heated discussion," after which Kucharski opened ISMS's exclusive territory to other distributors.[10] (Tr. 12/16/15 AM, pp. 114-17; Tr. 12/17/15 AM, pp. 45-47.) ISMS continued making sales in the territory,[11] but eventually decided in May 2010 to stop selling Maier products altogether. (Tr. 12/17/15 AM, pp. 51, 59.)

II. Conclusions of Law

ISMS makes five claims against Maier: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a et seq. ("CUTPA"); (4) promissory estoppel; and (5) unjust enrichment. I make the following conclusions of law.

---

[9] Ertel did not testify as a live witness at trial. The parties agreed to admit his testimony as evidence by way of deposition designations.

[10] Kucharski explained that opening a distributor's exclusive territory means that if a distributor had a potential sale, it could contact Kucharski, who would check to see if the account had been declared by any other distributor. If it had not, the distributor would have the right to put the customer on a protected list, preventing other distributors from soliciting sales there. (Tr. 12/16/15 PM, p. 37.)

[11] ISMS received commissions for two sales it made after February 2010. (Pl. Ex. 25, 27.) Schuld testified that ISMS did not receive commission payments for three additional sales that were made directly by Maier after February 2010. (Tr. 12/17/15 PM, pp. 20-26, 35-39.)

A. <u>Breach of Contract</u>

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." <u>Chiulli v. Zola</u>, 97 Conn. App. 699, 706-07 (2006) (internal quotation marks omitted). ISMS's breach of contract claim is based on its contention that Maier agreed

> ISMS would be paid a 10% across the board commission on every Maier machine and ancillary machine part sold to any customer in the ISMS exclusive territory including sales to Maier house accounts. [Maier] further agreed that such commission would not be reduced by any discount provided by Maier to any customer on any such sale and, in the event their agreement was terminated, ISMS would be given 6 months to register and close deals.

(Pl.'s Proposed Stmt. Facts, Doc. #75, ¶ 12.)

ISMS has failed to meet its burden of showing that the parties agreed to terms as ISMS describes them. <u>See</u> <u>Elec. Contractors, Inc. v. Pike Co.</u>, No. 3:11-CV-01449 (JAM), 2015 WL 3453348, at *13 (D. Conn. May 29, 2015) (citing <u>Madigan v. Hous. Auth. of Town of E. Hartford</u>, 156 Conn. App. 339 (2015)) ("[Plaintiff] bears the burden to prove its breach of contract claim by a preponderance of the evidence.").

Considering the evidence presented at trial, I find that the parties entered into an oral agreement whereby ISMS would market, promote, and sell Maier machines and ancillary equipment in the six New England states. ISMS would be the exclusive distributor

8

in this territory, with the exception of Maier's house account with Alpha Grainger.[12] ISMS would receive commission at a rate of 10% of the sales price of Maier-supplied products and 5% of the sales price of ancillary equipment, net of any discounts given to the customer.[13] There was no term to the agreement and either party could terminate it at any time. Maier paid ISMS commissions in accordance with this structure and ISMS never complained that the payments were incorrect. There is insufficient evidence to prove otherwise. Based on the foregoing, ISMS has failed to prove by a preponderance of the evidence that Maier breached the terms of the parties' agreement.

B. <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

"[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." <u>De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.</u>, 269 Conn.

---

[12] Schuld testified that despite being a house account, Maier agreed to pay ISMS 10% commission on any direct sales Maier made to Alpha Grainger. (Tr. 12/17/15 AM, pp. 25, 40, 100-01.) The court finds Maier's testimony more credible that he "was very clear" that "nobody got anything from Alpha Grainger" because of Maier's longstanding relationship with the owner. (Tr. 12/17/15 PM, pp. 74-75.)

[13] Despite the parties' intention to model their agreement on the Tornos contract, Schuld testified that Kucharski agreed ISMS would receive a 10% straight commission on all sales, including ancillary items, and that ISMS would not "share in the discounting" of machines. (Tr. 12/17/15 AM, pp. 19-20, 90, 104.) Schuld admitted that this is inconsistent with the Tornos agreement. (Tr. 12/17/15 AM, pp. 88, 105, 108.) The evidence is insufficient to support Schuld's contention that Maier agreed to this commission structure.

424, 432 (2004) (internal quotation marks omitted). The covenant of good faith and fair dealing requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement." Habetz v. Condon, 224 Conn. 231, 238 (1992). To recover on a claim of breach of the implied covenant of good faith and fair dealing,

> the plaintiff must plead: (1) that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; (2) that the defendant engaged in conduct that injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract; and (3) that when committing the acts by which it injured the plaintiff's right to receive under the contract, the defendant was acting in bad faith

Capitol Food Mart, Inc. v. Capital Donuts, LLC, No. HHD-CV-116022952, 2012 WL 432526, at *1 (Conn. Super. Ct. Jan. 18, 2012).

ISMS argues that Maier acted in bad faith by making direct sales to customers in ISMS's exclusive territory, which deprived ISMS of the commissions it expected to receive under the agreement. Specifically, ISMS contends that it is owed commission payments for Maier's two direct sales to Alpha Grainger, as well as three other direct sales Maier made to New England companies after Kucharski opened ISMS's exclusive territory. ISMS has failed to prove its claim. Maier's direct sales to Alpha Grainger were excluded from ISMS's exclusive sales territory and thus, Maier was not required to pay ISMS

10

commissions for the sales Maier made there. As for the three direct sales Maier made after February 2010, ISMS has offered no persuasive evidence that it is entitled to commissions.[14]

ISMS additionally argues that Maier breached the implied covenant by terminating ISMS's exclusive territory without notice or cause. The evidence shows, however, that either party could terminate the agreement at any time.

    C. CUTPA

"[A] violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy." Vezina v. Nautilus Pools, Inc., 27 Conn. App. 810, 819 (1992). When determining whether a practice violates CUTPA, Connecticut courts consider

> (1) whether the practice . . . offends public policy as it has been established by statutes, the common law, or otherwise . . . (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers . . . . [A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy.

Kosiorek v. Smigelski, 138 Conn. App. 695, 711 (2012) (internal quotation marks omitted).

ISMS argues that Maier violated CUTPA by (1) failing to disclose to ISMS that it made direct sales of its machines to

---

[14] Schuld testified that ISMS was not involved in making these sales, nor did Schuld know the dates they were made. (Tr. 12/17/15 PM, pp. 20-26, 35-39.) ISMS never registered leads with these companies, nor did he ask Kucharski to place them on a protected list. (Tr. 12/16/15 PM, pp. 38-40, 47, 49.)

customers in ISMS's exclusive territory; (2) intentionally withholding from ISMS copies of purchase orders, price quotes, order confirmations, and invoices for the sales ISMS made; and (3) opening ISMS's exclusive territory to other distributors based on Kucharski's personal sentiments toward Schuld.

ISMS has failed to prove that Maier engaged in any conduct violative of CUTPA. First, the parties agreed that ISMS would not receive commission on Maier's direct sales to Alpha Grainger. As to sales after Kucharski terminated ISMS's exclusive territory, ISMS could register leads and add customers to a protected list, preventing any other distributors from soliciting sales there. ISMS did not do so. ISMS also has failed to show that Maier intentionally withheld purchase orders, price quotes, order confirmations, and invoices in order to prevent ISMS from calculating commissions. Lastly, because either party could terminate the agreement at any time, ISMS has not established that Maier violated CUTPA by opening ISMS's exclusive territory based on Kucharski's personal feelings toward Schuld.

    D. <u>Promissory Estoppel</u>

"Under the doctrine of promissory estoppel, [a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. A

fundamental element of promissory estoppel . . . is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." D'Ulisse-Cupo v. Bd. of Dir. of Notre Dame High Sch., 202 Conn. 206, 213 (1987) (internal quotation marks omitted). "[P]romissory estoppel serves as an alternative basis to enforce a contract." Torringford Farms Ass'n, Inc. v. City of Torrington, 75 Conn. App. 570, 576 (2003).

ISMS asserts that it relied to its detriment on Maier's promises that ISMS would be the exclusive distributor of Maier machines in the New England territory; that it would receive a straight 10% commission on the sale of every Maier machine and ancillary part sold in the territory; that it would be reimbursed for marketing expenses; and that it would not be terminated as an exclusive distributor except upon reasonable notice and for just cause. ISMS has not offered sufficient evidence to support a finding that Maier made any such clear and definite promises.

E. Unjust Enrichment

"Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." Gagne v. Vaccaro, 255 Conn. 390, 401 (2001) (internal quotation marks omitted). "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the

plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." <u>Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.</u>, 231 Conn. 276, 283 (1994) (internal quotations omitted). "Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment . . . at least in the absence of a breach of contract by the defendant." <u>Polverari v. Peatt</u>, 29 Conn. App. 191, 199, 614 A.2d 484, 489 (1992) (citations omitted).

ISMS argues that Maier has been unjustly enriched by not paying ISMS a straight 10% commission on sales made to customers in ISMS's exclusive territory. The evidence reflects that the parties had an enforceable contract pursuant to which Maier paid ISMS for the benefits Maier received. As such, ISMS's unjust enrichment claim fails.

III. <u>Conclusion</u>

Judgment shall enter in favor of defendant Maier on all counts. This is not a recommended ruling. The parties have consented to trial before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. (Doc. #55.)

SO ORDERED at Hartford, Connecticut this 31st day of March, 2016.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge